T.C. Memo. 2013-6

UNITED STATES TAX COURT

F-STAR PROPERTY MANAGEMENT, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18303-10.                        Filed January 10, 2013.

David Palmer Leeper, for petitioner.

Chris J. Sheldon, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge:  This proceeding commenced pursuant to section

7430(f)(2)[1] is an appeal to the Court with respect to petitioner's request for

_____

[1]All section references are to the Internal Revenue Code (Code) in effect at
all relevant times.  All Rule references are to the Tax Court Rules of Practice and
Procedure.

**[\*2]** administrative costs.[2]

## FINDINGS OF FACT

All of the facts in this case, which the parties submitted under Rule 122, have been deemed established for purposes of this case under Rule 91(f) or stipulated by the parties and are so found.[3]

Petitioner, F-Star Property Management, Inc., is a corporation with its principal place of business in Scottsdale, Arizona.

Gerald Ayoub (Mr. Ayoub) owns directly or indirectly various entities that constitute a group of entities known collectively as Five Star Development.[4]  The principal activities of Five Star Development are the purchase of certain land, the development of that land into commercial warehouses or retail space, and the leasing and the management of those developed properties.  (We shall refer to the rental commercial properties of Five Star Development as the developed real properties.)  A separate limited partnership for tax and State law purposes holds

---

[2]Title XXVI, Tax Court Rules of Practice and Procedure, governs actions for administrative costs.  That title contains Rules 270 through 274.

[3]Unless otherwise stated, our findings of fact, although frequently stated in the present tense, pertain to all relevant times.

[4]Mr. Ayoub owns 47 percent of Southwest Food Processing & Refrigeration Services, one of the entities in Five Star Development.

[*3] each of the developed real properties. (We shall refer collectively to all of the limited partnerships, each of which holds one of the developed real properties, as the developed real property limited partnerships.)

Included among the entities in Five Star Development are F-Star Property Management, Inc., a C corporation for Federal income tax (tax) purposes and petitioner in the instant proceeding, F-Star Management, LLC,[5] a disregarded entity for tax purposes, F-Star Development, L.P. (F-Star Development), a limited partnership for tax purposes,[6] and the developed real property limited partnerships. Mr. Ayoub owns directly all of the stock of petitioner, a 100-percent interest in F-Star Management, LLC, a 99-percent interest in F-Star Development, and a 99-percent interest in each of the developed real property limited partnerships. F-Star Management, LLC, owns the remaining one-percent interest in F-Star Development and in each of the developed real property limited partnerships.

Petitioner, whose sole stockholder and chief executive officer is Mr. Ayoub, manages the developed real properties. According to tax returns that petitioner filed, including respective tax returns for its taxable years 2004 and 2005, the sole

---

[5]Although the name F-Star Management, LLC, is similar to the name of petitioner, F-Star Management, LLC, is not petitioner.

[6]F-Star Development also is a limited partnership for State law purposes.

**[\*4]** "Business activity" and "Product or service" of petitioner is "PROPERTY MANAGEMENT".

Mr. Ayoub and Claudia Ayoub (Ms. Ayoub)[7] filed a tax return for each of their taxable years 2004 (Ayoubs' 2004 return) and 2005 (Ayoubs' 2005 return). The Ayoubs attached to each of those returns Schedule C, Profit or Loss From Business (Schedule C). In the respective Schedules C that the Ayoubs attached to the Ayoubs' 2004 return and the Ayoubs' 2005 return, they reported $916,850 and $586,503 in gross receipts.

Petitioner filed Form 1120, U.S. Corporation Income Tax Return, for each of its taxable years 2004 (petitioner's 2004 return) and 2005 (petitioner's 2005 return). In petitioner's 2004 return and petitioner's 2005 return, petitioner reported taxable income of zero and a loss of $6,989, respectively. Petitioner deducted in petitioner's 2004 return and petitioner's 2005 return claimed management fees of $1,146,279 (2004 claimed management fee expense deduction) and $1,197,957 (2005 claimed management fee expense deduction), respectively.

Around May 10, 2007, respondent assigned a revenue agent (respondent's revenue agent) to examine petitioner's 2004 return. On a date in 2007 not

---

[7]We shall sometimes refer to Mr. Ayoub and Ms. Ayoub as the Ayoubs.

**[*5]** established by the record, respondent also assigned respondent's revenue agent to examine the Ayoubs' 2004 return and Form 1065, U.S. Return of Partnership Income (Form 1065), that F-Star Development filed for its taxable year 2004. Around early 2008, respondent's revenue agent expanded his examination to include petitioner's 2005 return, the Ayoubs' 2005 return, and Form 1065 that F-Star Development filed for its taxable year 2005.

On May 10, 2007, respondent's revenue agent made the following entry in his so-called Examining Officer's Activity Record (activity record) with respect to his examination of petitioner's 2004 return:

> Prepared Form 5345-D to open the 2004 tax return and turned it into the Group Manager for approval. Called the POA [power of attorney holder] to discuss the opening of this tax return and to explain the items that I will request on the initial IDR [informal discovery request]. He informed me that the earliest that he would be able to start putting together any records was the 24th. I told him that I would give him the two weeks, but would call after that and set up the initial appointment.

On May 30, 2007, respondent's revenue agent made the following entry in his activity record: "POA called and left a message at 11:30am. Called POA back at 12:27pm and we agreed to set the initial interview on June 22nd at 8:00am at the taxpayer's El Paso office."

On June 22, 2007, respondent's revenue agent made the following entry in his activity record: "Interviewed the POA at 9:00am at the taxpayer's El Paso

[*6] office.  Finished the write-up of the initial interview.  The only item the POA provided was the 800 page general ledger."

On June 25, 2007, respondent's revenue agent made the following entry in his activity record:  "Reviewed the general ledger and noted that it did not show where the owner's [Mr. Ayoub's] salary is paid from and it does not show how the Management Fees were paid out."

On June 28, 2007, respondent's revenue agent made the following entry in his activity record:  "The POA called at 10:55am to discuss the case and we agreed to meet on July 13th & 16th to go over the requested record."

On July 10, 2007, respondent's revenue agent made the following entry in his activity record:  "Called the POA to discuss the next meeting for July 13th to see if he was going to have all the requested material ready.  The POA said that he is running behind and needs until July 20th to have the items available for me to review.  We agreed to have the next meeting on July 20th at 9:00 am."

On July 18, 2007, respondent's revenue agent made the following entry in his activity record:  "Called and left a message with the POA at 3:56pm to see if it was alright to move the appointment from Friday the 20th to Monday the 23rd.  The POA called back and said that he needed more time to get the records ready.  We agreed to meet on August 2nd."

**[*7]** On July 31, 2007, respondent's revenue agent made the following entry in his activity record: "The POA called and left a message at 4:33pm to let me know that he would not have the records ready for the meeting on Thursday, August 2nd."

On August 1, 2007, respondent's revenue agent made the following entry in his activity record: "Left a message with the POA * * * to discuss rescheduling of the August 2nd meeting. * * * We agreed to meet on August 17th and 20th to go over the requested items."

On November 8, 2007, respondent's revenue agent made the following entry in his activity record: "Called the POA at 2:22pm and discussed all of the outstanding requests were holding up the case. He said he would call back with a status of the outstanding items."

On November 13, 2007, respondent's revenue agent made the following entry in his activity record:

> The POA called to discuss what was still outstanding on this case. I talked about the outstanding items from the initial IDR and also about the request that I had outstanding with their employee leasing company. He asked me to fax him a copy of the third party request and the initial IDR. We agreed to meet early in December at the taxpayer's El Paso office and that he should have all the requested items available by then. Faxed a copy of the third party request and the initial IDR to the POA.

[*8] On December 3, 2007, respondent's revenue agent made the following entry

in his activity record:

> The taxpayer provided the 2004 Adjusted Trial Balance for F-Star
> Property Management, Inc. Tied the books to the tax return with no
> discrepancies noted. Reviewed the POA's reconciliation to the
> employee leasing expense for the development company and the
> management company and could not reconcile the amounts to the
> returns.

On January 31, 2008, respondent's revenue agent made the following entry

in his activity record: "Started writing up the minimum income probe with the little

information that was made available by the POA. Could not get the amount

of rents reported by the entities to reconcile with the rents received by the

management company."

On February 12, 2008, respondent's revenue agent made the following entry

in his activity record: "Started the write-up of the Management Fees deduction.

Based on the information made available by the POA, the owner takes these fees

from the management company to avoid being taxed at the corporate level."

On February 19, 2008, respondent's revenue agent made the following entry

in his activity record: "Prepare 5345-D for the subsequent 2005 tax return and

turned into Group Manager for approval. Prepared Form 4564, the 2nd IDR with

a due date of March 4th and faxed it to the POA. Called the POA and we agreed to

meet at the taxpayer's El Paso office at 8:00am on March 4th."

[*9]  On March 6, 2008, respondent's revenue agent made the following entry in his activity record:[8]  "The POA faxed 11 pages at 1:35pm that included the breakdown of the Management Fees and the payout to the owner.  Prepared write up of the Management Fees and prepared all lead sheets and workpapers to the extent possible to get case file ready for the audit report."

By letter dated March 8, 2008, petitioner's representative provided, inter alia, the following information to respondent's revenue agent:

**Job Description**

Mr. Ayoub is owner and CEO of the group of companies known as Five Star Development.  Mr. Ayoub is involved in all aspects of each company within the group.  His duties consist of development of investment (real estate) opportunities, review and supervision of day to day operations, coordination of company financial activities, negotiation of business points on contracts, leasing of various buildings and overall supervision of construction projects.

On May 14, 2008, respondent's revenue agent made the following entry in his activity record:  "Started the write-up of Management Fees Deduction vs. Constructive Dividends."

---

[8]Hereinafter, references to respondent's revenue agent's activity record are to that record with respect to not only his examination of petitioner's 2004 return but also his examination of petitioner's 2005 return that the agent commenced around early 2008.

**[*10]** On May 15, 2008, respondent's revenue agent made the following entry in his activity record: "Finished the write-up of Management Fees Deduction vs. Constructive Dividends. Turned in case file to the Group Manager to review."

On May 19, 2008, respondent's revenue agent made the following entry in his activity record: "Met with the Group Manager and he wanted me to research case law and rewrite the argument to fit the case law."

On May 29, 2008, respondent's revenue agent made the following entry in his activity record: "[R]esearched the court cases for a similar case and found one. The issue of Management Fees Deduction vs. Constructive Dividends is on the right track per the court case, but the argument needs revision. Started putting the facts in line to follow the court case."

On June 2, 2008, respondent's revenue agent made the following entry in his activity record: "Finished writing up the Management Fees Deduction issue and met with the Group Manager to review the argument. The Group Manager had some suggestions on arranging the facts to fit the argument."

Respondent's revenue agent prepared a workpaper (revenue agent's workpaper) with respect to his examination of petitioner's 2004 return and petitioner's 2005 return. He stated in pertinent part in that report:

**[*11] Facts**: * * *

F-Star Property Management, Inc. (taxpayer) operates and manages over seven million square feet of commercial rental real estate with a diverse portfolio.  The taxpayer specializes in all facets of property management and provides a full range of services. * * *

\*     \*     \*     \*     \*     \*     \*

The taxpayer is 100% owned by sole shareholder and CEO, Jerry Ayoub.  Mr. Ayoub also owns directly and indirectly all of the commercial rental properties that are managed by the taxpayer.  The CEO also owns 42% of Southwest Food Processing and Refrigeration Services, Inc. which paid Mr. Ayoub a salary of $186,333 in 2004 and $44,500 in 2005. * * *

\*     \*     \*     \*     \*     \*     \*

The taxpayer paid the management fees to CEO and sole shareholder, Jerry Ayoub as an independent contractor in both 2004 and 2005.  (See Exhibit - E)  However, Mr. Ayoub is a corporate officer and should have been paid reasonable wages for any services provided.

The taxpayer provided a job description for Mr. Ayoub.  One of his job descriptions is, "Development of investment (real estate) opportunities".  This service is not a service provided by the taxpayer. * * *

The taxpayer has not provided a contract or any documentation to support the payments made to Mr. Ayoub.  Also, there's no formal documentation to show how the management fees paid were computed and that the taxpayer is responsible for paying those fees.

\*     \*     \*     \*     \*     \*     \*

**Argument**:

\*     \*     \*     \*     \*     \*     \*

[*12] Section 162(a) allows deductions for all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including--(1) a reasonable allowance for salaries or other compensation for personal services actually rendered."  If the corporation is closely held and the persons receiving the compensation are shareholders, the payments are subject to close scrutiny to determine whether the alleged compensation is in fact a distribution of profits.  *Elliotts, Inc. v. Commissioner * * ***, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. and remanding on other grounds T.C. Memo. 1980-282.  Whether an expense claimed pursuant to section 162(a) is compensation for services rather than a distribution of profits is a question of fact that must be decided on the basis of the particular facts and circumstances.  *Paula Construction Co. v. Commissioner * * ***, 58 T.C. 1055, 1058-1059 (1979), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973).  Under section 1.162-7(a), Income Tax Regs., the "test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services."

The burden is on F-Star Property Management, Inc. to prove that (1) the payments to Mr. Ayoub were reasonable and (2) the payments to Jerry Ayoub were for services actually rendered.  Rule 142(a).  In the case of *Jesse A. Ruf and Angela K. Ruf v. Commissioner* [CCH Dec. 48,891(M)], fees paid to corporate shareholders allegedly as compensation for consulting services were properly characterized as constructive dividends because the petitioners failed to prove these payments were reasonable and for services actually rendered.

F-Star Property Management, Inc. charges 4 ½% monthly management fees on the rents collected from all the commercial rental properties that it manages for Mr. Ayoub.  It is unreasonable to pay Mr. Ayoub as CEO the 4 ½% as management fees for the services he provides to the taxpayer, when the taxpayer employs various employees to conduct all business operations at the corporate headquarters in El Paso, Texas and Scottsdale, Arizona.

**[\*13]** Finally, there's no written contract between the taxpayer and Mr. Ayoub for services to be provided and the enumeration [sic] to be paid. In the event that a contract were to exist, the management fees would be highly questionable, since he's an officer of the corporation and should have been receiving wages for any services provided.

In conclusion, the management fees are denied in total as a deductible expense for 2004 and 2005.

\* \* \* These distributions can be classified as a Constructive or Disguised Dividend, a Return on Capital, or a Capital Gain.

**Conclusion**: *(Reflects the final determination on the issue.)*
The Management Fees paid to Mr. Ayoub of $1,146,279 in 2004 and $1,197,957 in 2005 have been determined not ordinary and necessary as required by IRC § 162(a). The payments received by Mr. Ayoub have been determined to be a distribution of profits; Therefore, these amounts are not a deductible expense. Adjustments to Management Fee Expense of $1,146,279 in 2004 and $1,197,957 in 2005 are warranted.

**Alternative Position**:
In the event that the disallowance in full of the Management Fees Deduction is not sustained, an alternate position would be allow part of the Management Fees Deduction as a reasonable salary to Mr. Ayoub and disallowing the rest as a distribution of profits to Mr. Ayoub.

Based on research done on website Salary.com, the median salary for a typical Top Commercial Real Estate Executive in Phoenix, AZ is $200,468. When you take the median salary of $200,468 and subtract $186,333 of salary already received by Mr. Ayoub in 2004 from a related entity, it equals $14,135 of salary expense allowable in 2004. When you take the median salary of $200,468 and subtract $44,500 of salary already received by Mr. Ayoub in 2005 from a related entity, it equals $155,968 of salary expense allowable in 2005. \* \* \*

[*14]    *    *    *    *    *    *    *

**Taxpayer Position**: * * *
The CFO argues that due to the sole shareholder's job duties, he [Mr. Ayoub] deserves to make the management fees that were paid and deducted as an expense to the corporation.

On June 9, 2008, respondent sent a so-called 30-day letter to petitioner for its taxable years 2004 and 2005 that included a copy of respondent's revenue agent's workpaper. (We shall refer to the 30-day letter and the revenue agent's workpaper included with that letter as the 2004 and 2005 30-day letter.) The principal proposed adjustments in the 2004 and 2005 30-day letter were the disallowance of petitioner's 2004 claimed management fee expense deduction and its 2005 claimed management fee expense deduction. The 2004 and 2005 30-day letter informed petitioner of its right to request a conference with respondent's Appeals Office (Appeals Office) and if such a conference were requested, its obligation to submit a formal written protest to that office because the total proposed change in tax for each of petitioner's taxable years 2004 and 2005 exceeded $25,000. Petitioner did not request a conference with the Appeals Office, submit a formal protest to that office, or otherwise contact representatives of respondent with respect to the adjustments proposed in the 2004 and 2005 30-day letter.

[*15] On October 9, 2008, respondent issued a notice of final partnership administrative adjustment to F-Star Development, L.P., for its taxable years 2004 and 2005 (F-Star Development FPAA).

On October 27, 2008, respondent's revenue agent made the following entry in his activity record with respect to his examination of petitioner's 2004 return and petitioner's 2005 return: "Discussed case w[ith] [respondent's] attorney & determined that due to TP's [taxpayer's] lack of response and inability to support his position, an economist is not necessary at this point in time."

On November 4, 2008, respondent issued a notice of deficiency to petitioner for its taxable years 2004 and 2005 (F-Star Property Management notice). In that notice, respondent determined to disallow the 2004 claimed management fee expense deduction of $1,146,279 and the 2005 claimed management fee expense deduction of $1,197,957. In support thereof, respondent made the following determinations in the F-Star Property Management notice:

> The claimed deductions $1,146,279.00 and $1,197,957.00 for management fees, as shown on your December 31, 2004 and December 31, 2005 tax returns, respectively, are not allowed. It has not been established that these amounts constitute ordinary and necessary business expenses, were expended, or were expended for the designated purpose. It is determined that these amounts were constructive dividends and/or capital gain distributions paid to Gerald Ayoub. Accordingly, your taxable income is increased by $1,146,279.00 and $1,197,957.00 for the taxable years ended December 31, 2004 and December 31, 2005, respectively.

[*16] Alternatively, it is determined that the deduction paid should be reduced by $1,132,144.00 and $1,041,989 for the taxable years ended December 31, 2004 and December 31, 2005, respectively. These amounts exceed reasonable compensation for personal services.

Petitioner did not file a petition with the Court with respect to the F-Star Property Management notice.

On November 4, 2008, the same day on which respondent issued to petitioner the F-Star Property Management notice, respondent issued to Mr. Ayoub and Ms. Ayoub a notice of deficiency with respect to their taxable years 2004 and 2005 (Ayoub notice). In the Ayoub notice, respondent made certain determinations that were related or correlative to the determinations that respondent made in the F-Star Property Management notice to disallow petitioner's 2004 claimed management fee expense deduction and 2005 claimed management fee expense deduction. In the Ayoub notice, respondent determined, inter alia, deficiencies in the Ayoubs' tax of $146,266 and $113,464 for their taxable years 2004 and 2005, respectively. In support of those deficiencies, respondent determined, inter alia, that the Ayoubs had failed to include in income for their taxable years 2004 and 2005 $917,955 and $786,039, respectively, as

[*17] constructive dividends to the Ayoubs from petitioner.[9]  In the Ayoub notice, respondent further determined that the Ayoubs had failed to include in income for their taxable years 2004 and 2005 $227,324 and $411,918, respectively, as long-term capital gains from petitioner to the Ayoubs.[10]

On November 10, 2008, F-Star Management, LLC,[11] the tax matters partner of F-Star Development, filed a petition with the Court with respect to the F-Star Development FPAA (F-Star Development case), thereby commencing the case at docket No. 27312-08.

Around January 14, 2009, the F-Star Development case was referred to the Appeals Office for consideration.  An officer with the Appeals Office (Appeals officer) was assigned to that case.

---

[9]In the Ayoub notice, respondent determined to reduce to zero the Ayoubs' respective gross receipts that they reported in the Ayoubs' 2004 return and the Ayoubs' 2005 return.

[10]For the Ayoubs' taxable year 2004, the $917,955 of constructive dividends and the $227,324 of long-term capital gain totaled $1,145,279, which was $1,000 less than the 2004 claimed management fee expense deduction of $1,146,279 that respondent determined to disallow in the F-Star Property Management notice.  That is because respondent determined that $1,000 of that $1,146,279 disallowed deduction is a return of capital attributable to Mr. Ayoub's basis in his stock in petitioner.

[11]See supra note 5.

[*18] On February 3, 2009, Mr. Ayoub and Ms. Ayoub filed a petition with the Court with respect to the Ayoub notice (Ayoub case), thereby commencing the case at docket No. 2612-09. (We shall sometimes refer collectively to the F-Star Development case and the Ayoub case as the two related cases.)

Around March 11, 2009, the Ayoub case was referred to the Appeals Office for consideration. The Ayoub case was assigned to the same Appeals officer to whom the F-Star Development case had been assigned.

Because petitioner did not petition the Court with respect to the F-Star Property Management notice, respondent assessed the deficiencies for petitioner's taxable years 2004 and 2005 and the addition to tax under section 6651(a)(1) for its taxable year 2004, as determined in that notice. In response to that assessment, petitioner's representative, David P. Leeper (Mr. Leeper),[12] sent a letter dated April 3, 2009 (Mr. Leeper's April 3, 2009 letter) to "Internal Revenue Service, Chief Counsel SB/SE, Attn: Thomas Fenner" in Houston, Texas. Mr. Leeper attached to that letter, inter alia, a copy of (1) the F-Star Development FPAA, (2) the petition filed in that case, and (3) the answer filed in that case. Mr. Leeper's April 3, 2009 letter stated in pertinent part: "These tax years [2004 and 2005] are before the United States Tax Court yet, the taxes have already been assessed. What can we do

_____

[12]Mr. Leeper is attorney of record for petitioner in this case.

**[\*19]** to abate the assessment or suspend the collection * * * pending resolution of this case?"

Around April 6, 2009, Thomas Fenner, respondent's counsel in the two related cases, responded to Mr. Leeper's April 3, 2009 letter. In that response, respondent's counsel stated in pertinent part:

> We received your letter dated April 3, 2009 regarding assessments on the accounts for F-Star Property Management, Inc. for the tax years 2004 and 2005. In your letter, you suggest that the assessments were improper because "[t]hese tax years are before the United States Tax Court." You included with your letter the FPAA, petition, and answer for the F-Star Development, L.P. case.

> We are in the process of gathering information with respect to F-Star Property Management, Inc. for the tax years 2004 and 2005. We will ask the Service to temporarily refrain from further collection activity while we gather information.

> From the information we have so far been able to obtain, however, it does not appear that F-Star Property Management, Inc. was a partner in F-Star Development, L.P. in 2004 or 2005. The assessments therefore do not appear to be based on the FPAA issued to F-Star Development, L.P.

> Please let us know as soon as possible if there is another case docketed in the Tax Court for F-Star Property Management, Inc. or why you think the assessments are prohibited by the petition filed in the F-Star Development, L.P. case.

On April 6, 2009, the Appeals officer made the following entry in his so-called Case Activity Record Print with respect to the F-Star Development case:

**[*20]** TC from * * * [respondent's counsel in the two related cases] re: whipsaw assessment on related C corp [petitioner, F-Star Property Management, Inc.]; Corp is not partner in this partnership; searched thru file for any related corp records; non[e] found. He [respondent's counsel in the two related cases] indicates case will likely be on Nov. Hou. calendar. Another related case is partner [in F-Star Development]: Gerald Ayoub.

On April 7, 2009, the Appeals officer sent an email to respondent's counsel in the two related cases. In that email, the Appeals officer stated: "I had our records section put a stayup on the accounts. However, the assessments are most likely valid since they are not TEFRA flow through adjustments and are governed by the ASED [assessment statute expiration date] of the corporation."

On April 15, 2009, the Appeals officer made the following entry in his Case Activity Record Print with respect to the Ayoub case: "Docketed case related to F-Star Development, LP and F-Star Propert[y] [Management], Inc. Prelim review of RAR; apparent whipsaw issue on related C corp [petitioner, F-Star Property Management, Inc.], which did not petition TC w/[respondent's] Counsel [in the two related cases] and they have requested admin file on C corp and will forward to me when they are through with it."

On May 29, 2009, respondent's counsel in the two related cases sent a memorandum to the Appeals officer. In that memorandum, respondent's counsel in the two related cases stated: "Enclosed per your request are the 2004 and 2005

[*21] Forms 1120 and associated administrative files for [petitioner] F-Star

Property Management, Inc.  Please call me * * * if you have any questions."

It was only after the Appeals officer was made aware of the F-Star Property

Management notice and during that officer's consideration of the settlement

potential of the Ayoub case and the F-Star Development case that he concluded

that certain determinations in the Ayoub notice were related and corresponded to

the determinations in the F-Star Property Management notice to disallow

petitioner's claimed 2004 management fee expense deduction and its 2005 claimed

management fee expense deduction.  (We shall refer to the disallowed deductions

in the F-Star Property Management notice as the correlative determinations.)  The

Appeals officer also concluded that any settlement of the determinations in the

Ayoub notice that were related or corresponded to the correlative determinations in

the F-Star Property Management notice would necessarily result in a corresponding

settlement of those correlative determinations.

On June 2, 2009, the Appeals officer made the following entry in his Case

Activity Record Print with respect to the F-Star Property Management notice:

> Rec'd case [relating to F-Star Property Management notice with
> respect to which F-Star Property Management, Inc., did not file a
> petition with the Court] from * * * [respondent's counsel in the two
> related cases] as related case to F-Star Development, LP and Gerald
> Ayoub (both docketed cases).  This case [of F-Star Property
> Management, Inc.] did not petition and has been assessed.  TP has

**[\*22]** presented informal claim sicne [sic] issue is directly related to Ayoub issue."

The Appeals officer prepared a document entitled "Appeals Transmittal and Case Memo" dated November 24, 2009 (Appeals officer's case memo). That memo stated in pertinent part:

## DISCUSSION AND ANALYSIS

IRC §3121(d)(1) defines an employee to include any officer of a corporation.

Ruf v. Comm, (T.C. Memo 1993-81) fees paid to corporate shareholders allegedly as compensation for consulting services were properly characterized as constructive dividends because the petitioner failed to prove these payments were reasonable and for services actually rendered. In Ruf the court found that various documents between the parties involved "demonstrate that petitioner was using various types of payments to distribute profits according to stock ownership. Lumber City has failed to present any evidence to rebut inferences drawn from these documents."

## MY EVALUATION

The Service argues that it is unreasonable for the F-Star Property Management to pay Mr. Ayoub a 4.5% management [fee] for the services he provides to the corporation when the corporation has employees to conduct all of the business operations at the corporate headquarters on El Paso and in Scottsdale, AZ. The Ruf case appears to have a different set of circumstances than this case. In Ruf, the management fee agreement was made in conjunction and simultaneously to a corporate reorganization that was taking place. In addition, the court found several documents between the parties reveal the intent to distribute the consulting fees in proportion to their stock

[*23] holdings. In this case we have no such circumstances. As such, Ruf is not relevant to this case.

The taxpayer contends that the management fees paid to the taxpayer are reasonable in light of the work done by Ayoub. Jerry Ayoub has been in the real estate development business for many years. He originates all projects and is intricately involved in the development of all projects from design, financing and property management. The taxpayer points out that he receives no other compensation from any of his real estate entities. The taxpayer argues that his salary is not unreasonable. The taxpayer argues that the Service's alternative position that only $14,135 and $155,968 is not supported by an expert report and the use of a generic website (salary.com) does not account for the taxpayer's expertise and his success.

The Service's position that the management fee arrangement between F-Star Property Management and Ayoub is a mechanism to distribute the earnings and profits of the corporation is not supportable. If the management fees were paid out in wages, there would still not be any earnings and profits. The only way this position has merit is if the management fees or salary are unreasonable. Given Ayoub's expertise and involvement in the many real estate ventures of his F-Star companies, the Service faces insurmountable litigating hazards with holding that the vast majority of the management fees are unreasonable compensation. The management fees received by the Ayoub was $916,850 and $586,503 for 2004 and 2005, respectively, do not appear unreasonable given his history of developing successful real estate projects. The Service's reliance upon a website for its position would not be seen as an expert in determining reasonableness of compensation. Based upon these hazards the Service should concede the issue proposed against the Ayoub and the corporation. However in the analysis of this issue it was noted that there was a discrepancy between the amount accrued by the corporation and what was actually paid to Ayoub. Ayoub received only $916,850 of the $1,146,279 accrued for 2004 and $586,503 of the $1,197,957 accrued for 2005. As such §267 limits the corporate deduction to the amounts actually received and reported by the controlling shareholder. As

**[*24]** such, the corporation should be denied $229,429 for 2004 and $611,454 and 2005.

After considering all of the issues in the two related cases, the Appeals officer concluded that, in order to have consistent treatment of the determinations in the Ayoub notice that were related or corresponded to the correlative determinations in the F-Star Property Management notice, the Appeals Office should partially concede and partially sustain those correlative determinations. The Appeals officer thus made such a recommendation to the Appeals Office.[13] The Appeals Office accepted the Appeals officer's recommendation. As a result, in accordance with the Appeals officer's recommendation which the Appeals Office accepted, respondent partially abated the assessments for taxable years 2004 and 2005 that respondent had made after F-Star Property Management, Inc., did not file a petition with the Court with respect to the F-Star Property Management notice.

---

[13]The Appeals officer recommended that the Appeals Office concede $916,850 of the 2004 claimed management fee expense deduction and $586,503 of the 2005 claimed management fee expense deduction, the respective amounts that the Ayoubs had received and included in income in the Ayoubs' 2004 return and the Ayoubs' 2005 return. The Appeals officer did not recommend that the Appeals Office concede the respective remaining amounts of those claimed deductions because the Ayoubs had not received and included in income those respective remaining amounts in the Ayoubs' 2004 return and the Ayoubs' 2005 return.

**[\*25]** On a date not disclosed by the record, the parties in the Ayoub case submitted to the Court a stipulated decision document (Ayoub stipulated decision document). On January 14, 2010, the Court entered a decision in the Ayoub case  pursuant to the agreement of the parties, as reflected in the Ayoub stipulated decision document.

On a date not disclosed by the record, the parties in the F-Star Development case submitted to the Court a stipulated decision document (F-Star Development stipulated decision document).  On January 22, 2010, the Court entered a decision in the F-Star Development case pursuant to the agreement of the parties, as reflected in the F-Star Development stipulated decision document.

By letter dated February 17, 2010, Mr. Leeper submitted to respondent on petitioner's behalf a request for administrative costs.  Respondent did not respond to that request.

On August 16, 2010, petitioner filed a petition with the Court in which it claimed administrative costs under section 7430(a)(1).  On September 13, 2010, petitioner filed with the Court an amended petition claiming such administrative costs.  That amended petition stated that respondent failed "to rule upon its application for an award of reasonable administrative costs."  The amended petition also stated that petitioner is claiming $89,401.25 in administrative costs.

**[\*26]**                                   OPINION

Petitioner is appealing respondent's denial of its request for administrative costs.[14]  Section 7430(a)(1) authorizes an award to the prevailing party of reasonable administrative costs incurred in connection with an administrative proceeding within the Internal Revenue Service involving the determination, collection, or refund of any tax, interest, or penalty under the Code, provided that certain requirements (discussed below) are satisfied.

The term "prevailing party" for purposes of section 7430(a) generally means any party who (1) has substantially prevailed with respect to (a) the amount in controversy, sec. 7430(c)(4)(A)(i)(I), or (b) the most significant issue or set of issues presented, sec. 7430(c)(4)(A)(i)(II), and (2) meets the net worth requirements of 28 U.S.C. sec. 2412(d)(2)(B) (2006), sec. 7430(c)(4)(A)(ii).[15]  In order to qualify for an award of administrative costs under section 7430(a)(1), the prevailing party must not have unreasonably protracted the administrative

---

[14]Respondent's failure to respond to petitioner's request for administrative costs is treated as a denial of petitioner's request for administrative costs under sec. 301.7430-2(c)(6), Proced. & Admin. Regs.

[15]Respondent acknowledges that petitioner has complied with both sec. 7430(c)(4)(A)(i)(I) and sec. 7430(c)(4)(A)(ii).

**[*27]** proceeding.  Sec. 7430(b)(3).[16]  The party seeking an award of administrative costs under section 7430(a)(1) has the burden of establishing that all of the foregoing criteria have been satisfied and that the costs claimed are reasonable administrative costs as defined in section 7430(c)(2).

Section 7430(c)(4)(B)(i) provides the following exception to the definition of the term "prevailing party" in section 7430(c)(4)(A):  "A party shall not be treated as the prevailing party in a proceeding * * * if the United States establishes that the position of the United States in the proceeding was substantially justified."    We consider here only whether respondent's position in the administrative proceeding was not substantially justified.[17]  See sec. 7430(c)(4)(B)(i).  We address only that question because our resolution of that question resolves the issue whether petitioner is entitled to an award under section 7430(a)(1).  Respondent has the burden in the instant proceeding of establishing that respondent's position in the administrative proceeding was substantially justified.  See sec. 7430(c)(4)(B)(i).

---

[16]Respondent maintains that petitioner has not established that it has complied with sec. 7430(b)(3).

[17]If respondent's position were not substantially justified in the administrative proceeding, petitioner would qualify as the "prevailing party" for purposes of sec. 7430(a)(1).

**[\*28]** The position of the United States is substantially justified if it "is one that is 'justified to a degree that could satisfy a reasonable person' or that has a 'reasonable basis both in law and fact.'" Swanson v. Commissioner, 106 T.C. 76, 86 (1996) (quoting Pierce v. Underwood, 487 U.S. 552, 565 (1988)). "A position has a reasonable basis in fact if there is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Corkrey v. Commissioner, 115 T.C. 366, 373 (2000) (citing Underwood, 487 U.S. at 564-565). In determining whether the position of the Commissioner of Internal Revenue (Commissioner) was substantially justified, we must "consider the basis for * * * [the Commissioner's] legal position and the manner in which the position was maintained." Wasie v. Commissioner, 86 T.C. 962, 969 (1986). Whether the Commissioner acted reasonably will be resolved "upon those available facts which formed the basis for the position taken in the notice of deficiency * * *, as well as upon any legal precedents related to the case." Maggie Mgmt. Co. v. Commissioner, 108 T.C. 430, 443 (1997). The Commissioner's position "may be incorrect but substantially justified 'if a reasonable person could think it correct'." Id. (quoting Underwood, 487 U.S. at 566 n.2).

A significant factor in determining whether the Commissioner's position is substantially justified as of a given date is whether, on or before that date, the

[*29] taxpayer has presented all relevant information under the taxpayer's control and relevant legal arguments supporting the taxpayer's position. Corson v. Commissioner, 123 T.C. 202, 206-207 (2004); sec. 301.7430-5(c)(1), Proced. & Admin Regs.

The Commissioner's concession of an issue is not conclusive as to whether the Commissioner's position with respect to that issue was substantially justified. See Corkrey v. Commissioner, 115 T.C. at 373; Sokol v. Commissioner, 92 T.C. 760, 767 (1989); Wasie v. Commissioner, 86 T.C. at 968-969. In other words, the Commissioner's concession of an issue, standing alone, does not establish that the Commissioner took an unreasonable position with respect to that issue. See Lavallee v. Commissioner, T.C. Memo. 1997-183, 1997 WL 189928, at *5.

In order to determine whether the position of the United States is substantially justified, courts "must identify the point at which the United States is first considered to have taken a position, and then decide whether the position taken from that point forward was or was not substantially justified." Maggie Mgmt. Co. v. Commissioner, 108 T.C. at 442.

For purposes of an administrative proceeding, the "position of the United States" means "the position taken in an administrative proceeding to which subsection (a) [of section 7430] applies as of the earlier of--(i) the date of the

[*30] receipt by the taxpayer of the notice of the decision of the Internal Revenue Service Office of Appeals, or (ii) the date of the notice of deficiency." Sec. 7430(c)(7)(B).

On the record before us, we conclude that respondent's position in the administrative proceeding with respect to petitioner's claimed 2004 management fee expense deduction and its 2005 claimed management fee expense deduction is respondent's position as of November 4, 2008, as reflected in the notice of deficiency that respondent issued to petitioner on that date. See, e.g., Maggie Mgmt. Co. v. Commissioner, 108 T.C. at 442.

It is respondent's position in the instant proceeding that on or before November 4, 2008, the date on which respondent issued the F-Star Property Management notice to petitioner, petitioner had failed to provide respondent with records and other documentation and information that established petitioner's entitlement under section 162(a) to its 2004 claimed management fee expense deduction and its 2005 claimed management fee expense deduction. As a result, according to respondent, respondent's position as of November 4, 2008, to disallow those claimed deductions, as reflected in that notice, was reasonable in fact and in law and thus was substantially justified under section 7430(c)(4)(B)(i).

[*31] It is petitioner's position that respondent's position in the F-Star Property Management notice and thus in the administrative proceeding was not substantially justified under section 7430(c)(4)(B)(i). In support of its position, petitioner argues that what the Appeals officer stated in the Appeals officer's case memo dated November 24, 2009, "is strong evidence the Respondent's position in Petitioner's Notice of Deficiency was not reasonable as a matter of law." According to petitioner, "To understand the Respondent's position in Petitioner's Notice of Deficiency, we look to the analysis of that position made by Respondent's Appeals Officer * * * in his analysis of Petitioner's Notice of Deficiency (Exhibit 11-J) [in the Appeals officer's case memo]."

As we understand it, petitioner is arguing that the Appeals officer's partial concession of petitioner's 2004 claimed management fee expense deduction and its 2005 claimed management fee expense deduction and the reasons in support of that partial concession that that officer stated in the Appeals officer's case memo dated November 24, 2009, establish that respondent's position as of November 4, 2008, with respect to those deductions, as reflected in the F-Star Property Management notice issued to petitioner on that date, was not reasonable in fact and in law and thus was not substantially justified. On the record before us, we reject any such argument of petitioner.

[*32] The Appeals officer's case memo set forth his analysis of why he believed that respondent should partially concede petitioner's 2004 claimed management fee expense deduction and its 2005 claimed management fee expense deduction. The Appeals officer's partial concession of those deductions and his reasons in support thereof are not conclusive in establishing that respondent's position as of November 4, 2008, to disallow all of those deductions, as reflected in the F-Star Property Management notice, was not substantially justified. See Corkrey v. Commissioner, 115 T.C. at 373. That partial concession and those reasons simply do not, standing alone, establish that respondent's position as of that date to disallow petitioner's 2004 claimed management fee expense deduction and its 2005 claimed management fee expense deduction, as reflected in that notice, was unreasonable in fact and in law and thus was not substantially justified. See Lavallee v. Commissioner, 1997 WL 189928, at *5.

Before turning to an examination of respondent's position as of November 4, 2008, to disallow under section 162(a) petitioner's 2004 claimed management fee expense deduction and its 2005 claimed management fee expense deduction, we will summarize the applicable requirements of section 162(a) and certain other applicable requirements with which petitioner was obligated to comply in order to be entitled to those deductions under that section.

[*33] Section 162(a) provides in pertinent part that "[t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including--(1) a reasonable allowance for salaries or other compensation for personal services actually rendered". Where, as here, the case involves a closely held corporation with the controlling shareholder setting his own level of compensation, the reasonableness of the compensation is subject to close scrutiny. Devine Bros., Inc. v. Commissioner, T.C. Memo. 2003-15 (citing Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1324 (5th Cir. 1987), aff'g T.C. Memo. 1985-267).

Whether an expense claimed under section 162(a)(1) is compensation for services rather than a distribution of profits is a question of fact and must be decided on the basis of the particular facts and circumstances. Pursuant to section 1.162-7(a), Income Tax Regs., the "test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services." The regulations under section 162(a)(1) also provide in pertinent part:

> Any amount paid in the form of compensation, but not in fact as the purchase price of services is not deductible. An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees, it would seem likely that the salaries are

**[\*34]** not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. * * * [Sec. 1.162-7(b)(1), Income Tax Regs.]

Deductions, including deductions under section 162(a), are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any deduction claimed. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). The Code and the regulations thereunder require the taxpayer to maintain records sufficient to establish the amount of any deduction claimed. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

The applicable legal principles summarized above imposed on petitioner the burden to establish, by providing records and other documentation and information to respondent's revenue agent (or to another representative of respondent), that the respective management fees that petitioner paid to Mr. Ayoub during petitioner's taxable years 2004 and 2005 for services that petitioner claims he rendered to it were for services that he actually rendered to it, were reasonable, and were otherwise deductible under section 162(a)(1). See sec. 1.162-7(a) and (b), Income Tax Regs.

We turn now to an examination of respondent's position as of November 4, 2008, to disallow petitioner's 2004 claimed management fee expense deduction and its 2005 claimed management fee expense deduction, as reflected in the F-Star

**[\*35]** Property Management notice. As we do so, we bear in mind that our resolution of whether respondent acted reasonably in taking the position as of November 4, 2008, to disallow under section 162(a) petitioner's 2004 claimed management fee expense deduction and its 2005 claimed management fee expense deduction, as reflected in the F-Star Property Management notice, is to be based "upon those available facts which formed the basis for the position taken in the notice of deficiency [issued to petitioner] * * *, as well as upon any legal precedents related to the case." See Maggie Mgmt. Co. v. Commissioner, 108 T.C. at 443. We also bear in mind that a significant factor in our determination of whether the position of respondent as of November 4, 2008, was substantially justified is whether on or before November 4, 2008, the date on which the F-Star Property Management notice was issued, petitioner had presented to respondent all relevant information under its control and relevant legal arguments supporting its position. See Corson v. Commissioner, 123 T.C. at 206-207; sec. 301.7430-5(c)(1), Proced. & Admin. Regs.

In support of respondent's position as of November 4, 2008, to disallow petitioner's 2004 claimed management fee expense deduction and its 2005 claimed management fee expense deduction, as reflected in the F-Star Property Management notice, respondent determined in that notice: "It has not been

**[\*36]** established that these amounts constitute ordinary and necessary business expenses [under section 162(a)], were expended, or were expended for the designated purpose."[18]  Respondent thus determined in the F-Star Property Management notice that petitioner is not entitled to its 2004 claimed management fee expense deduction and its 2005 claimed management fee expense deduction because petitioner had failed to establish that it satisfied the requirements of section 162(a).

In determining whether respondent's position as of November 4, 2008, as reflected in the F-Star Property Management notice, was reasonable in fact and in law and thus was substantially justified, the following entries in respondent's revenue agent's activity record and in respondent's revenue agent's workpaper are instructive as are the facts that after respondent sent the 2004 and 2005 30-day letter to petitioner on June 9, 2008, petitioner did not request a conference with the Appeals Office, submit a formal protest to that office, or otherwise contact representatives of respondent with respect to the adjustments in that 30-day letter.

---

[18]Respondent set forth in the F-Star Property Management notice the following alternative position:  "Alternatively, it is determined that the deduction paid should be reduced by $1,132,144.00 and $1,041,989 for the taxable years ended December 31, 2004 and December 31, 2005, respectively.  These amounts exceed reasonable compensation for personal services."

**[\*37]** On June 22, 2007, respondent's revenue agent made the following entry in his activity record: "Interviewed the POA at 9:00am at the taxpayer's El Paso office. Finished the write-up of the initial interview. The only item the POA provided was the 800 page general ledger."

On June 25, 2007, respondent's revenue agent made the following entry in his activity record: "Reviewed the general ledger and noted that it did not show where the owner's [Mr. Ayoub's] salary is paid from and it does not show how the Management Fees were paid out."

On July 10, 2007, respondent's revenue agent made the following entry in his activity record: "Called the POA to discuss the next meeting for July 13th to see if he was going to have all the requested material ready. The POA said that he is running behind and needs until July 20th to have the items available for me to review. We agreed to have the next meeting on July 20th at 9:00 am."

On July 18, 2007, respondent's revenue agent made the following entry in his activity record: "Called and left a message with the POA at 3:56pm to see if it was alright to move the appointment from Friday the 20th to Monday the 23rd. The POA called back and said that he needed more time to get the records ready. We agreed to meet on August 2nd."

[*38] On July 31, 2007, respondent's revenue agent made the following entry in his activity record: "The POA called and left a message at 4:33pm to let me know that he would not have the records ready for the meeting on Thursday, August 2nd."

On November 8, 2007, respondent's revenue agent made the following entry in his activity record: "Called the POA at 2:22pm and discussed all of the outstanding requests were holding up the case. He said he would call back with a status of the outstanding items."

On November 13, 2007, respondent's revenue agent made the following entry in his activity record:

> The POA called to discuss what was still outstanding on this case. I talked about the outstanding items from the initial IDR and also about the request that I had outstanding with their employee leasing company. He asked me to fax him a copy of the third party request and the initial IDR. We agreed to meet early in December at the taxpayer's El Paso office and that he should have all the requested items available by then. Faxed a copy of the third party request and the initial IDR to the POA.

On December 3, 2007, respondent's revenue agent made the following entry in his activity record: "The taxpayer provided the 2004 Adjusted Trial Balance for F-Star Property Management, Inc."

On January 31, 2008, respondent's revenue agent made the following entry in his activity record: "Started writing up the minimum income probe with the little information that was made available by the POA. Could not get the amount

[*39] of rents reported by the entities to reconcile with the rents received by the management company."

On February 12, 2008, respondent's revenue agent made the following entry in his activity record: "Started the write-up of the Management Fees deduction. Based on the information made available by the POA, the owner takes these fees from the management company to avoid being taxed at the corporate level."

On March 6, 2008, respondent's revenue agent made the following entry in his activity record: "The POA faxed 11 pages at 1:35pm that included the breakdown of the Management Fees and the payout to the owner. Prepared write up of the Management Fees and prepared all lead sheets and workpapers to the extent possible to get case file ready for the audit report."

In respondent's revenue agent's workpaper, respondent's revenue agent stated:

> **Facts**: * * *
> F-Star Property Management, Inc. (taxpayer) operates and manages over seven million square feet of commercial rental real estate with a diverse portfolio. The taxpayer specializes in all facets of property management and provides a full range of services. * * *
>
>     *      *      *      *      *      *      *
>
> The taxpayer is 100% owned by sole shareholder and CEO, Jerry Ayoub. Mr. Ayoub also owns directly and indirectly all of the commercial rental properties that are managed by the taxpayer. The

[*40] CEO also owns 42% of Southwest Food Processing and Refrigeration Services, Inc. which paid Mr. Ayoub a salary of $186,333 in 2004 and $44,500 in 2005.

    \*       \*       \*       \*       \*       \*       \*

The taxpayer paid the management fees to CEO and sole shareholder, Jerry Ayoub as an independent contractor in both 2004 and 2005. (See Exhibit - E) However, Mr. Ayoub is a corporate officer and should have been paid reasonable wages for any services provided.

The taxpayer provided a job description for Mr. Ayoub. One of his job descriptions is, "Development of investment (real estate) opportunities". This service is not a service provided by the taxpayer. * * *

The taxpayer has not provided a contract or any documentation to support the payments made to Mr. Ayoub. Also, there's no formal documentation to show how the management fees paid were computed and that the taxpayer is responsible for paying those fees.

    \*       \*       \*       \*       \*       \*       \*

**Argument**:

    \*       \*       \*       \*       \*       \*       \*

Section 162(a) allows deductions for all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including--(1) a reasonable allowance for salaries or other compensation for personal services actually rendered." If the corporation is closely held and the persons receiving the compensation are shareholders, the payments are subject to close scrutiny to determine whether the alleged compensation is in fact a distribution of profits. *Elliotts, Inc. v. Commissioner* * * *, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. and remanding on other grounds T.C. Memo. 1980-282. Whether an expense claimed pursuant to section 162(a) is compensation for services rather than a distribution of profits is a

**[*41]** question of fact that must be decided on the basis of the particular facts and circumstances. *Paula Construction Co. v. Commissioner* * * *, 58 T.C. 1055, 1058-1059 (1979), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973). Under section 1.162-7(a), Income Tax Regs., the "test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services."

The burden is on F-Star Property Management, Inc. to prove that (1) the payments to Mr. Ayoub were reasonable and (2) the payments to Jerry Ayoub were for services actually rendered. Rule 142(a). In the case of *Jesse A. Ruf and Angela K. Ruf v. Commissioner* [CCH Dec. 48,891(M)], fees paid to corporate shareholders allegedly as compensation for consulting services were properly characterized as constructive dividends because the petitioners failed to prove these payments were reasonable and for services actually rendered.

F-Star Property Management, Inc. charges 4 ½% monthly management fees on the rents collected from all the commercial rental properties that it manages for Mr. Ayoub. It is unreasonable to pay Mr. Ayoub as CEO the 4 ½% as management fees for the services he provides to the taxpayer, when the taxpayer employs various employees to conduct all business operations at the corporate headquarters in El Paso, Texas and Scottsdale, Arizona.

Finally, there's no written contract between the taxpayer and Mr. Ayoub for services to be provided and the enumeration [sic] to be paid. In the event that a contract were to exist, the management fees would be highly questionable, since he's an officer of the corporation and should have been receiving wages for any services provided.

In conclusion, the management fees are denied in total as a deductible expense for 2004 and 2005.

* * * These distributions can be classified as a Constructive or Disguised Dividend, a Return on Capital, or a Capital Gain.

**[\*42] Conclusion**: *(Reflects the final determination on the issue.)*
The Management Fees paid to Mr. Ayoub of $1,146,279 in 2004 and
$1,197,957 in 2005 have been determined not ordinary and necessary as
required by IRC § 162(a).  The payments received by Mr. Ayoub have
been determined to be a distribution of profits; Therefore, these
amounts are not a deductible expense.  Adjustments to Management
Fee Expense of $1,146,279 in 2004 and $1,197,957 in 2005 are
warranted.

**Alternative Position**:
In the event that the disallowance in full of the Management Fees
Deduction is not sustained, an alternate position would be allow part of
the Management Fees Deduction as a reasonable salary to Mr. Ayoub
and disallowing the rest as a distribution of profits to Mr. Ayoub.

Based on research done on website Salary.com, the median salary for a
typical Top Commercial Real Estate Executive in Phoenix, AZ is
$200,468.  When you take the median salary of $200,468 and subtract
$186,333 of salary already received by Mr. Ayoub in 2004 from a
related entity, it equals $14,135 of salary expense allowable in 2004.
When you take the median salary of $200,468 and subtract $44,500 of
salary already received by Mr. Ayoub in 2005 from a related entity, it
equals $155,968 of salary expense allowable in 2005. * * *

\*    \*    \*    \*    \*    \*    \*

**Taxpayer Position**: * * *
The CFO argues that due to the sole shareholder's job duties, he [Mr.
Ayoub] deserves to make the management fees that were paid and
deducted as an expense to the corporation.

On October 27, 2008, respondent's revenue agent made the following entry in

his activity record:  "Discussed case w[ith] [respondent's] attorney & determined

**[\*43]** that due to TP's [taxpayer's] lack of response and inability to support his position, an economist is not necessary at this point in time."

On the record before us, we find that as of November 4, 2008, the date on which respondent issued the F-Star Property Management notice, petitioner had provided to respondent's revenue agent very limited records, documentation, or other information in support of petitioner's position that it is entitled under section 162(a)(1) to its 2004 claimed management fee expense deduction and its 2005 claimed management fee expense deduction for the respective services that petitioner claimed Mr. Ayoub rendered to it during 2004 and 2005. On the record before us, we find that as of November 4, 2008, the date on which respondent issued the F-Star Property Management notice, petitioner had failed to satisfy its burden of establishing its entitlement under section 162(a)(1) to its claimed 2004 management fee expense deduction and its 2005 claimed management fee expense deduction by providing adequate records and other pertinent documentation and information to respondent's revenue agent during respondent's examination of petitioner's taxable years 2004 and 2005 or to a representative of the Appeals Office after respondent issued the 2004 and 2005 30-day letter to petitioner.[19]

---

[19]Petitioner's pattern of not doing what it was required to do in order to establish its entitlement under sec. 162(a)(1) to its 2004 claimed management fee

(continued...)

[*44] Based upon our examination of the entire record before us, we find that respondent's position as of November 4, 2008, to disallow petitioner's 2004 claimed management fee expense deduction and its 2005 claimed management fee expense deduction, as reflected in the F-Star Property Management notice, had a reasonable basis in both fact and law. On that record, we further find that respondent has satisfied respondent's burden under section 7430(c)(4)(B)(i) of establishing that respondent's position in the administrative proceeding was

-----

[19](...continued)
expense deduction and its 2005 claimed management fee expense deduction continued after respondent issued the F-Star Property Management notice to petitioner on November 4, 2008. Thus, petitioner did not file a petition with the Court with respect to the F-Star Property Management notice that respondent issued on November 4, 2008. As a result, respondent assessed the deficiencies for petitioner's taxable years 2004 and 2005 and the addition to tax for its taxable year 2004 that respondent determined in that notice. It was only in response to that assessment that petitioner's representative, Mr. Leeper, sent to respondent Mr. Leeper's April 3, 2009 letter. Mr. Leeper attached to that letter, inter alia, a copy of (1) the F-Star Development FPAA, (2) the petition filed in that case, and (3) the answer filed in that case. Mr. Leeper's April 3, 2009 letter stated in pertinent part: "These tax years [2004 and 2005] are before the United States Tax Court yet, the taxes have already been assessed. What can we do to abate the assessment or suspend the collection * * * pending resolution of this case?"

[*45] substantially justified.[20]  On the record before us, we hold that petitioner is not entitled to an award of administrative costs under section 7430(a)(1).

We have considered all of the parties' respective contentions and arguments that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

An appropriate decision will be entered.

---

[20]Assuming arguendo that respondent had not met respondent's burden under sec. 7430(c)(4)(B)(i) of establishing that respondent's position in the administrative proceeding was substantially justified, on the record before us we would find that petitioner has not carried its burden of establishing, inter alia, that the claimed administrative costs were incurred solely on behalf of petitioner and in connection with the administrative proceeding relating to petitioner, see sec. 7430(a)(1), (c)(2), were incurred or paid by petitioner, see sec. 7430(a)(1), (c)(2); Republic Plaza Props. P'ship v. Commissioner, T.C. Memo. 1997-239, slip op. at 5-8, and were reasonable, see sec. 7430(c)(2).